# STATE OF CONNECTICUT *v.* DANIEL MILLS
## (AC 18460)

Lavery, Spear and Daly, Js.[1]

Argued January 19—officially released April 18, 2000

---

[1] The listing of judges reflects their seniority status on this court as of the date of oral argument.

*Auden Grogins*, special public defender, for the appellant (defendant).

*James M. Ralls*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Mary Reidy*, assistant state's attorney, for the appellee (state).

*Opinion*

LAVERY, J. The defendant, Daniel Mills, appeals from the judgment of conviction, rendered after a jury trial, of conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 (a) and 53a-134 (a) (4), attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-134 (a) (4), attempt to commit larceny in the second degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-123 (a) (3), and inciting injury to persons in violation of General Statutes § 53a-179a. The defendant claims that the trial court improperly denied (1) his motion to suppress identification testimony that was based on a claimed violation of the defendant's right to due process under the fourteenth amendment to the United States constitution and (2) his motion for a new trial that was based on the court's allegedly improper dismissal of a juror. We affirm the judgment of the trial court.

The following facts are relevant to this appeal. On May 10, 1996, the victim, Daniel Penn, was walking home at about 2 a.m. when he was approached by two young men. The young men stood on either side of him, and one of them put a gun to his head and said, "Give me what you got."

Although the lighting was somewhat dim because tree branches obscured the streetlight above, Penn was able to get a good look at both men. Penn described the gunman, who had put on a ski mask as he

approached Penn, as being about five feet, eleven inches tall, skinny, and wearing a black jacket, black pants, white sneakers and a mask. The other man, identified later as the defendant, was shorter than Penn, with short hair, light brown skin and a small mustache. This second man was wearing a black leather jacket and brown designer boots.

Penn used the distraction of an oncoming car to flee. As Penn fled, yelling loudly, the gunman dropped to one knee, aimed his weapon at Penn and said, "Why don't we just pop him?" The defendant said twice, "Shoot him." Penn reached his home and the police were contacted.

Joseph Foti, a uniformed officer with the New Haven police department, met Penn and radioed in a description of the two men. Penn and Foti then went to an area where a suspect was being held. Penn viewed the suspect, who was flanked by officers and was brightly illuminated, and concluded that he was definitely not one of the two men, as he was too big, too tall and his boots were different.

Foti drove to another location where a second suspect, the defendant, was being detained. Even before Foti stopped the car, Penn viewed the well-lighted suspect and twice said, "That's him." Penn concluded that it was the shorter assailant because of his brown boots, leather jacket and the peculiar nature of his "squinty" eyes, something that Penn stated he would "never forget." Foti asked Penn if he was absolutely positive it was the same man. Penn stated that he had no doubt that it was the same person, as he remembered the defendant's face and other characteristics. The defendant was arrested as a result of the identification, and a trial commenced on February 18, 1998. In addition to identifying the defendant that night, Penn identified the

defendant at trial from a group of seven black men, all dressed similarly to the defendant.

At the end of closing arguments, but before the court had charged the jury, a juror spoke with the court and expressed concern that the lawyers apparently agreed that the contested issue was identification of the defendant. The juror, a psychologist in private practice, had completed his doctoral dissertation some twenty years ago on the effects of misleading information on eyewitness testimony and memory. This information was not revealed to counsel at voir dire.

The court asked the juror if he felt that in reaching a verdict he might draw on his studies or special qualifications in this area. The juror confided that he was unsure whether he could refrain from revealing his specialized knowledge during deliberations. The court expressed concern that the juror's specialized knowledge was beyond that of an ordinary juror and, if discussed in deliberations, might influence the jury as a type of expert testimony not of record. The court then dismissed the juror from service.

I

The defendant contends that the court improperly denied his motion to suppress Penn's identification of the one-on-one show-up procedure because it violated his fourteenth amendment right to due process.[2] We disagree.

[2] After hearing argument on the motion to suppress, the court ruled, stating: "The nature of one-on-one show-ups is somewhat suggestive, but it is allowed. The law is clear on that. The question then becomes, was it unnecessarily suggestive, and police really didn't do anything to suggest to Mr. Penn that this is the person that he should pick out. The nature of the show-up, of course, does suggest that a person is a suspect, but there is no other way to do it, and it is allowed because this particular procedure can, if done in a fair fashion as it was here, can quickly, conclusively, eliminate a person as a suspect. So, it is allowed. The question of whether Mr. Penn's identification on that night and here in court today, whether that is reliable, the answer is yes, based on the totality of the circumstances. Mr. Penn had—it wasn't a fleeting glance at these people. It was an observation over

"Upon review of a trial court's denial of a motion to suppress, [t]he court's conclusions will not be disturbed unless they are legally and logically inconsistent with the facts. *State* v. *Cofield*, 220 Conn. 38, 44, 595 A.2d 1349 (1991). . . . *State* v. *MacNeil*, 28 Conn. App. 508, 512–13, 613 A.2d 296, cert. denied, 224 Conn. 901, 615 A.2d 1044 (1992). The trial court's factual findings will be reversed only if they are clearly erroneous." (Internal quotation marks omitted.) *State* v. *Owens*, 38 Conn. App. 801, 804, 663 A.2d 1094, cert. denied, 235 Conn. 912, 665 A.2d 609 (1995).

"In determining whether identification procedures violate a defendant's due process rights, [t]he required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances. . . . To prevail in his claim, the defendant must demonstrate that the trial court erred in both of its determinations regarding suggestiveness and reliability of identifications in the totality of the circumstances. . . . An identification procedure is unnecessarily suggestive only if it gives rise to a very substantial likelihood of irreparable misidentification. . . . If the procedures used to identify the defendant were not unnecessarily suggestive, we need not independently analyze whether the identification was reliable. . . . *State* v. *Taylor*, 239 Conn. 481, 498–99, 687 A.2d 489 (1996), cert. denied, 521 U.S. 1121, 117 S. Ct.

a significant period of time. The lighting was dim, but he said he had no trouble seeing. He gave a detailed description of the people that he had encountered. There was not a long lapse of time between the event and the identification. Apparently, his description matched the description of the defendant when he was apprehended. The level of Mr. Penn's certainty appeared to be very high.

"For those reasons, I will deny your motion to suppress."

2515, 138 L. Ed. 2d 1017 (1997). The defendant bears the burden of proving both that the identification procedures were unnecessarily suggestive and that the resulting identification was unreliable. *State* v. *White*, 229 Conn. 125, 162, 640 A.2d 572 (1994). Generally, [t]he exclusion of evidence from the jury is . . . a drastic sanction, one that is limited to identification testimony which is manifestly suspect. *State* v. *Wooten*, 227 Conn. 677, 685–86, 631 A.2d 271 (1993) . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Austin*, 244 Conn. 226, 246–47, 710 A.2d 732 (1998).

A one-on-one show-up does place upon the identification process an inherent level of suggestiveness and susceptibility to misidentification. *State* v. *Middleton*, 170 Conn. 601, 607–608, 368 A.2d 66 (1976). Show-ups, however, and procedures like them "tend under some circumstances to ensure accurate identifications and the benefit of promptness not only aids reliability but permits a quick release of an innocent party if there is no positive identification, allowing the police to resume the investigation with only a minimum of delay." *State* v. *Sims*, 12 Conn. App. 239, 242, 530 A.2d 1069, cert. denied, 206 Conn. 801, 535 A.2d 1315 (1987). The show-up identification used here involved the defendant standing with police on either side of him, with streetlights and car lights illuminating him. This scenario does retain an element of suggestiveness, but is not in itself so unduly suggestive such that it was improper. See *State* v. *Wooten*, supra, 227 Conn. 686 (confrontation between victim and suspect seated in back of police car suggestive, but not unnecessarily so); compare *State* v. *Askew*, 55 Conn. App. 34, 40 and n.5, 739 A.2d 274, cert. denied, 251 Conn. 918, 740 A.2d 866 (1999).

Furthermore, the identification was reliable on the basis of the totality of the circumstances. See *State* v. *Reddick*, 224 Conn. 445, 465, 619 A.2d 453 (1993) (reliability of unduly suggestive identification is linch-

pin of admissibility). The reliability of an identification procedure is considered under various factors, such as "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of [his] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself. *Manson* v. *Brathwaite*, 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977) . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Davis*, 198 Conn. 680, 683–84, 504 A.2d 1372 (1986).

In the present case, Penn had ample opportunity to view the defendant. Although the light available was dim, Penn was able to see the defendant clearly from very close range. See, e.g., *State* v. *Small*, 1 Conn. App. 584, 588–89, 474 A.2d 460 (1984) (witness viewed assailant from distances of two feet and six feet). Shortly after the incident, Penn provided an accurate description of the defendant to the police before any identification took place. As Foti recalled, Penn described "a light skinned black male, approximately five [feet], seven [inches], wearing a black jacket, blue jeans and light brown boots." This information was articulated, as perceived by the officer, "very well." See, e.g., *State* v. *Davis*, supra, 198 Conn. 684 (robbery victim provides accurate, detailed description). At the moment of identification, Penn did not hesitate to identify the defendant as one of the two individuals who attempted to rob him. See, e.g., *State* v. *Austin*, supra, 244 Conn. 249 (witness identified defendant immediately and with no uncertainty). Approximately forty minutes, at most, had passed between the crime and the confrontation.[3] See,

---

[3] The crime occurred at approximately 2 a.m., and the call to Foti from an officer nearby occurred at 2:38 a.m. that a second suspect, who ultimately was identified as the defendant, had been found.

e.g., *State* v. *Gettes*, 42 Conn. App. 472, 478, 680 A.2d 996, cert. denied, 239 Conn. 921, 682 A.2d 1009 (1996) (approving fifteen day interval between viewing of defendant and identification, and citing additional cases).

Penn was not searching for just anyone, but the individuals who robbed him. Penn's conclusion that the first suspect was not the person who robbed him "is not evidence of an initial misidentification but rather demonstrates the conduct of a witness exercising independence of judgment under stressful circumstances." *State* v. *Perez*, 198 Conn. 68, 74, 502 A.2d 368 (1985). Given his conduct, Penn demonstrated that he was "an unlikely candidate for subliminal seductions." Id., 75. Accordingly, we cannot conclude that the show-up violated the defendant's right to due process under the fourteenth amendment to the United States constitution.

II

The defendant contends that the court improperly denied the defendant's motion for a new trial on the basis of his claim that the court improperly dismissed a juror. We disagree.

The court, and not this tribunal, is in the best position to determine what effect, if any, the juror's special knowledge might have had on other jurors. Accordingly, " '[t]he trial court is vested with wide discretion in determining the competency of jurors to serve, and that judgment will not be disturbed absent a showing of an abuse of discretion.' *State* v. *Cubano*, 203 Conn. 81, 88–89, 523 A.2d 495 (1987); *State* v. *Anthony*, 172 Conn. 172, 175, 374 A.2d 156 (1976)." *State* v. *Tucker*, 226 Conn. 618, 630, 629 A.2d 1067 (1993). A trial court may dismiss a juror who is unable to perform his or her duties upon a finding of "cause." *State* v. *Allen*, 216 Conn. 367, 378, 579 A.2d 1066 (1990); see also General

Statutes § 54-82h (c). "On appeal, the defendant bears the burden of showing that the rulings of the trial court resulted in a jury that could not judge his guilt impartially. *State* v. *Marra*, 195 Conn. 421, 432, 489 A.2d 350 (1985)." *State* v. *Tucker*, supra, 630–31.

The court did not abuse its broad discretion in dismissing the juror. The uniqueness of the juror's dilemma only highlights the numerous possibilities that arise with regard to juror dismissal. For example, in *State* v. *Rokus*, 191 Conn. 62, 71, 463 A.2d 252 (1983), a juror expressed concern that he recognized a police officer who was going to testify. The juror told the court that he did not know the officer very well and had not seen him in three years. Id. The juror also added that he would not give any undue preference to the officer's testimony. Id. The court excused the juror, and our Supreme Court concluded that the trial court's action was not improper. Id., 71–72.

The juror in this case expressed less certainty of his ability to be impartial than did the juror in *Rokus*. The juror in this case could not assure the judge that he could keep his specialized knowledge private. The juror also could not assure the judge that he would not use his specialized knowledge regarding identification during jury deliberations. It is within a judge's discretion to dismiss a juror where, as here, that juror possesses a specialized area of knowledge beyond the typical juror that may unduly influence jury deliberations. See *State* v. *Wylie*, 10 Conn. App. 683, 696, 525 A.2d 528, cert. denied, 204 Conn. 807, 528 A.2d 1154 (1987) (excuse of juror because of greater than ordinary knowledge of weapons valid peremptory challenge).

Other courts have noted the importance of addressing in the jury selection process juror bias on the basis of a juror's expertise. In *State* v. *Saunders*, 992 P.2d 951, 962–64 (Utah 1999), the Supreme Court of Utah

reversed a trial court's decision to halt questions by attorneys of jurors who had claimed specialized knowledge of child sexual abuse in a case where the defendant was accused of sexual abuse of a child. "As a general rule, trial judges have some discretion in limiting voir dire inquiry. . . . That discretion is most broad when it is exercised with respect to questions that have no apparent link to any potential bias. However, the trial judge's discretion narrows to the extent that questions do have some possible link to possible bias, and when proposed voir dire questions go directly to the existence of an actual bias, that discretion disappears. The trial court must allow such inquiries." (Citation omitted.) Id., 963; see also *Brooks* v. *Zahn*, 170 Ariz. 545, 552, 826 P.2d 1171 (App. 1991) (attorney should have questioned juror with specialized knowledge in nursing during voir dire).

Furthermore, the defendant cannot show that the dismissal resulted in any harm to him. The defendant speculates that this juror would have been beneficial to the defendant had he remained on the jury because the juror, with his specialized knowledge, likely viewed identifications as being less accurate than does the average citizen. We cannot speculate as to what a juror would have concluded within the confines of the jury deliberation. See *Mack* v. *LaValley*, 55 Conn. App. 150, 160, 738 A.2d 718, cert. denied, 251 Conn. 928, 742 A.2d 363 (1999). The defendant has not shown how the dismissal of the juror created unfairness to the defendant. Accordingly, the court did not abuse its discretion in dismissing the juror.

The judgment is affirmed.

In this opinion the other judges concurred.