STATE OF CONNECTICUT *v.* TYREESE BOWENS
(AC 19070)

Spear, Zarella and Daly, Js.

Argued October 30, 2000—officially released March 6, 2001

*Robert G. Golger,* special public defender, for the appellant (defendant).

*Joy K. Fausey,* deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *John Waddock,* senior assistant state's attorney, for the appellee (state).

*Opinion*

SPEAR, J. The defendant, Tyreese Bowens, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a (a).[1] The defendant claims that the trial court improperly (1) dismissed an alternate juror who made allegations of racial prejudice against another juror and (2) denied his motion to suppress a witness' out-of-court photographic array identification. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On August 18, 1996, Kevin Hood, the victim, and Tiara Phelmetta were riding around New Haven in Hood's car. They stopped in front of a convenience store at the well lit intersection of Columbus Avenue, Arch Street and Washington Avenue. Hood made some purchases at the convenience store, and, upon his return to the car, Phelmetta noticed a man with a hooded jacket walking toward the car from Washington

---

[1] General Statutes § 53a-54a (a) provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

Avenue. The man came up to the front passenger seat window where she was seated and peered through from about three feet away. She was able to look closely at his facial features before he turned away and walked around the back of the car, appearing to head away from the car. Suddenly, the man changed course and again approached the car. As he walked up to the driver's side, Phelmetta saw him withdraw a gun from underneath his shirt. The man leaned into Hood's open window and shot Hood several times. Phelmetta jumped out of the car through her window and fled to safety.

Thereafter, officers from the New Haven police department patrolling on Columbus Avenue came upon the victim. A few minutes later, Phelmetta returned to the scene and told a police detective that she had witnessed the shooting and gave a description of the shooter. The following day, on August 19, 1996, Phelmetta went to the police station, viewed a photographic array and identified the defendant as the shooter. He was arrested and ultimately found guilty of murder in violation of § 53a-54a (a). This appeal followed.

I

The defendant claims that the court improperly dismissed an alternate juror, C, who had made allegations of racial prejudice against another juror, R. The defendant argues that when the court removed the alternate juror without cause it violated his right to a fair trial under article first, § 8, of the constitution of Connecticut and the sixth amendment to the United States constitution. We disagree.

We glean the following additional facts from the record and the transcript of the court's ruling. A jury of twelve regular jurors and four alternates was selected to hear the case. On the third day of trial, the court received a note from an alternate juror indicating that

one of the regular jurors had made some racially based remarks.[2] The court privately questioned the alternate juror, C, about the remarks referred to in the note. C told the court about three separate incidents where she had heard racially based remarks from the same juror, R.[3] After the court finished questioning C and consulted with counsel, the court questioned R, who adamantly denied making any racially based remarks.[4] Thereafter,

---

[2] The note from C stated: "Dear Judge Freedman, as uncomfortable as I am with this, I feel it is my duty to inform you a juror has made racist comments on more than one occasion and in the presence of a number of fellow jurymen. I feel confident that you will know how to address this situation. Thank you. [C]."

[3] The first incident about which C informed the court occurred in the elevator after lunch on May 28, 1998. In a conversation among several jurors, C heard R talk about eating lunch at Burger King. C said R had "used a lot of language—but basically said that she had been very uncomfortable because of all the niggers that were there, and they were crowding her and making her feel uncomfortable, and basically saying that she had lived in New Haven all her life, and you know, how terrible it was that it was coming to this."

The second incident that C related to the court occurred the following day when "a group of people were just sitting together and talking about our families, and [R] mentioned that she wouldn't let her son go down into the part of New Haven that he wanted to go to do some clothes shopping because all the people from the jungles were there, and she didn't want him, you know, to be affected by this and just, you know, a lot of—I mean, I don't remember all the comments, but it was an uncomfortable situation, and it was very obvious that she didn't think that there was anything wrong with what she was saying."

On May 29, 1998, the final incident occurred in the jury waiting room when C heard the same juror "talking about the fact that she lived in New Haven, and you know, someone asked her if she knew, you know, if there was a reason for her not to be here, because maybe she knew something, and she said, no, that she lived on the good side of the bridge. . . . You know, thank God I don't have to deal with the gangs."

[4] In response to the comment made in the elevator after lunch, R stated that she had related only that she "was uncomfortable about the crowd around me, but it was young kids. It wasn't—they were mixed. They weren't just black. I was just a little nervous with all the younger generation. I mean, younger. They were fifteen, sixteen years old." After being informed by the court that "[s]omebody said they heard the word 'nigger,' " she adamantly stated, "Never. Never. I don't ever use that word in my vocabulary." She also stated, "I never, I swear, I never said that word. I don't even allow that

the court questioned all of the other jurors in the presence of counsel for both sides.

The first five jurors were asked general questions as to whether they had heard any other jurors make racist comments or comments with racial overtones. All five stated that they had not. One of the five, described as an African-American woman, commented that she did not "feel any tension there either." The court implied that this was significant when it stated: "She certainly would be sensitive to anything."

The remaining nine jurors were questioned more closely by both the court and counsel. Seven of the nine were asked the general question whether they had heard any other jurors make racist or racially motivated comments. All seven responded that they had not. All nine were asked whether they had heard a comment about Burger King, and eight agreed that they had, but none of them had interpreted it as a racially motivated remark. Only five of the nine recalled a comment by a juror about not letting her son shop in selected areas of New Haven, but none of them recalled anything racist in her comment. Six of the nine remembered a juror comment about living on the good side of the bridge, but, again, none of them interpreted it as racist in nature. Six of the nine were asked if what they had heard would affect their ability to sit as a juror, and all six responded that it would not.

---

said in my household." In response to counsel's comment about her being "very uncomfortable because of all the niggers there," she replied, "Never. Never in a million years."

With regard to the second alleged remark, about jungle people, R responded that she did restrict her son from going into certain areas of New Haven by himself, "but I didn't say anything about any color, any race. It doesn't have to do with race and color. There's good and bad in all people." And when further questioned by counsel as to whether she had said anything about all the people from the jungle, she stated, "Never. Never. Never. No."

With respect to the third comment, about living on the good side of the bridge, she admitted that she lived in a good area and had said that, but that there were no references to gangs or not having to deal with gangs.

After all of the jurors were questioned, the defendant moved for a mistrial on the ground that the jury was compromised. The court denied the motion, concluding that "this jury was not in any way compromised, and that this defendant was not in any way prejudiced. [The jurors] said themselves that nothing affected their ability to be fair and impartial, and I have to believe them under the circumstances." The defendant then requested that the court remove R, the juror who allegedly made the racist comments. The state argued that R should not be removed because there was nothing to support C's allegations of racist comments, but that if the court removed R, C also should be removed.

The court granted both parties' requests and removed both jurors because the court did "not want a sideshow going on with the jury. I don't want them knowing that someone is watching them or someone isn't watching them. I want them watching the witnesses, and I'm not willing to set up a little trial within a trial." Although the court did not believe that R had used the racial words that C had alleged, the court believed that the subject matter of R's comments was inappropriate for the situation and, thus, removed her from the jury.

With regard to the removal of C, the court was troubled by her inaccurate account of the comments and her giving the court "false information without lying, and I don't believe she lied, but that's what she heard, and that's not borne out by any of the other people who heard the same information and were in the same position to hear that information." The next day the court explained further that "the court feels that it is not sensible to leave an alternate and a juror sitting when the alternate accused the juror of being a racist, in effect, and where the juror denied the charge and was basically supported by the other jurors, including the black juror, who as I indicate, said there simply [were] no racial epithets that she heard or any racial

derogatory comments. . . . The safest course, in my judgment, is to dismiss the juror and the alternate. We, thus, eliminate anyone involved in the issue from service or potential service, in the case of the alternate, both of whom said things that we just simply do not have the time to deal with and ferret out. Justice demands that we go on with this trial, and I cannot spend anymore time trying to find out who said what to whom at what time."

At sentencing, the court again commented regarding the removal of the alternate juror, C, stating that "I did feel that [the statements by C] were not true. And still feel that way. I still feel that she felt that they were true and that was one of the things that worried me because a juror who believes something which didn't happen is not a good juror."

General Statutes § 54-82h (c) provides in relevant part that "[i]f, at any time, any juror shall, for any reason, become unable to further perform his duty, the court may excuse him . . . ." Our Supreme Court has concluded that excusing a juror pursuant to this statute requires a "finding of cause. Thus, the trial court . . . could have excused the juror only upon a finding of cause." *State* v. *Allen*, 216 Conn. 367, 378, 579 A.2d 1066 (1990). "A person shall be disqualified to serve as a juror if such person is found by the judicial authority to exhibit any quality which will impair that person's capacity to serve as a juror . . . ." Practice Book § 42-5.

Our standard of review of a trial court's decision to remove a juror is clear. "[T]he trial court is vested with wide discretion in determining the competency of jurors to serve, and that judgment will not be disturbed absent a showing of an abuse of discretion. . . . A trial court may dismiss a juror who is unable to perform his or her duties upon a finding of cause." (Citations omitted; internal quotation marks omitted.) *State* v. *Mills*, 57

Conn. App. 356, 363, 748 A.2d 891 (2000); see also *State v. Cubano*, 203 Conn. 81, 88–89, 523 A.2d 495 (1987).

The defendant argues that there is nothing in the record to support the finding that C had become unable to perform her duties as a juror. Therefore, the defendant claims that the court's removal of C as an alternate juror was an abuse of discretion. We disagree.

The defendant relies on *State v. Santiago*, 245 Conn. 301, 339–40, 715 A.2d 1 (1998), a case that was decided approximately five weeks after the jury verdict in this case. *Santiago* provides guidelines for trial courts to follow when there are allegations of racial bias on the part of a juror.[5]

In *Santiago*, the Supreme Court held that in future cases, trial courts should investigate fully allegations of racial bias of jurors. "Extending the preliminary inquiry we required in [*State v. Brown*, 235 Conn. 502, 528, 668 A.2d 1288 (1995)] in situations of alleged racial bias beyond an initial inquiry of the individual reporting the conduct to encompass the interview of key players will not . . . prove any more disruptive of the judicial process than *Brown* has proven to be. . . . We cannot permit the jury's nor the public's attention to be diverted from the ultimate question of guilt or innocence that

---

[5] In *Santiago*, our Supreme Court concluded "that an allegation of racial bias on the part of a juror differs so fundamentally from other types of juror misconduct that [*State v. Brown*, 235 Conn. 502, 528, 668 A.2d 1288 (1995)] is of limited guidance and does not go far enough. Because such allegations are a matter of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole . . . we deem it appropriate in all future cases in which a defendant alleges that a juror has made racial epithets, such as in the present case, that the trial court should conduct a more extensive inquiry than that prescribed in *Brown*. Such inquiry should include, at a minimum, an extensive inquiry of the person reporting the conduct, to include the context of the remarks, an interview with any persons likely to have been a witness to the alleged conduct, and the juror alleged to have made the remarks." (Citation omitted; internal quotation marks omitted.) *State v. Santiago*, supra, 245 Conn. 340.

should be the central concern in a criminal proceeding . . . by the extraneous and irrelevant consideration of an immutable characteristic such as race or ethnicity, nor can we tolerate the suggestion that race or ethnicity played any role in the conviction of a criminal defendant." (Citations omitted; internal quotation marks omitted.) *State* v. *Santiago*, supra, 245 Conn. 339–40. "Our decision to provide additional guidelines for conducting a preliminary inquiry in situations of racial allegations in no way undermines the discretion we accord to the trial courts in making credibility assessments and determining the scope and form of inquiries. We exercise our supervisory authority in the present case to expand the scope of the preliminary inquiry because allegations of racial slurs are so inherently prejudicial as to merit additional scrutiny." Id., 336.

The defendant argues that although the court's prescience in fashioning a procedure that comported with the later issued dictates of *Santiago* is commendable, the court, nonetheless, violated the spirit and essence of *Santiago* when it removed C. Specifically, the defendant claims that the removal of C will have a chilling effect on jurors and will make them less likely to report racial remarks for fear of their own removal. Because the court's decision to remove C is supported by the record, we are not persuaded that the court in any way violated the spirit of *Santiago*.

C reported three separate incidents where she believed R had made racially motivated or racist comments. The court found that C was not credible, not because she was lying, but because her capacity to perceive was impaired. The trial court is the sole judge of the credibility of allegations by a juror and the capacity of a juror to serve. See id., 337; *State* v. *Mills*, supra, 57 Conn. App. 363. The court's determination that C was not capable of perceiving situations accurately was

within the court's discretion and was sufficient cause for her removal as an alternate juror.

The defendant argues that the court improperly excused C to penalize her for forcing the court to conduct an investigation once she alleged that racial comments were made. This argument is completely baseless. The court conducted a thorough investigation of the alleged racial comments and decided it did "not want a sideshow going on with the jury." Consistent with *Santiago*, the court eliminated any possibility of having an allegedly biased juror serve and kept the ultimate issue of the defendant's guilt or innocence central to the proceeding. We conclude that the court did not abuse its discretion in dismissing C.

Furthermore, even if the court had abused its discretion, the defendant cannot show that the dismissal of C resulted in any harm to him. The defendant claims that the harm incurred by C's dismissal was the lost opportunity to have C chosen to replace R. As one of the four alternates, C had a one in four chance of being chosen by lot to replace R.[6] We can only speculate as to whether C would have been chosen if the court had not removed her at the same time as R. Such speculation certainly cannot establish harm sufficient to reverse the judgment.

## II

The defendant also claims that the court improperly denied his motion to suppress Phelmetta's out-of-court photographic array identification. Specifically, the defendant argues that the photographic array presented

---

[6] General Statutes § 51-243 (d) provides in relevant part: "If . . . any juror shall . . . become unable to further perform his duty, the court may excuse him. If any juror is so excused . . . the court may order that an alternate juror who is designated by lot to be drawn by the clerk, shall become a part of the regular panel . . . ."

to Phelmetta was unnecessarily suggestive. We do not agree.

The following additional facts are relevant to this claim. During the trial, the defendant moved to suppress Phelmetta's out-of-court photographic identification. Outside of the jury's presence, the court held a hearing in which it heard testimony from Phelmetta and a police detective, Richard Foti, regarding the photographic array identification. Both witnesses testified that after Phelmetta told the police that she could identify the shooter, she gave the police a description, which included the fact that the shooter wore a hooded jacket. Using the description, eight similar photographs were chosen by computer. Two of the photographs chosen were of individuals with hoods, one of whom was the defendant. Prior to the photographs' being laid out, detectives told Phelmetta to look carefully at the photographs. Then, the group of eight photographs were randomly placed in rows on a table.

One detective testified that within ten to fifteen seconds after the photographs had been placed on the table, Phelmetta identified the defendant's photograph. He testified that she did not pick up a photograph until she had signed and dated the defendant's photograph.

Phelmetta testified that it took her approximately five minutes before she made an identification of the shooter. She testified that she picked up two photographs, one of which was of the defendant, before identifying the defendant as the shooter. Before the detectives had her sign the photograph, they told her to look again at all of the photographs. After doing so, she signed the defendant's photograph.

The defendant moved to suppress Phelmetta's out-of-court identification of him. He claimed that the array of photographs presented to the witness was unneces-

sarily suggestive and in violation of his right to due process. Specifically, the defendant argued that only two of the eight photographs in the array contained individuals wearing hooded jackets, the same clothing that the witness had identified the shooter as wearing. The defendant asserts that presenting a witness with a photograph of a person wearing clothing that so closely matches the description of the clothing of the shooter "causes that particular photograph to jump off the page." He also argued that the array was unnecessarily suggestive because there was a discrepancy in the testimony with regard to the amount of time it took for Phelmetta to identify the defendant, there was a discrepancy in the testimony as to whether Phelmetta picked up a photograph prior to the identification and the array had light-skinned males that did not have the same features as the defendant.

The court rejected the defendant's arguments and denied the motion, stating: "Gentlemen, I looked at the photos in the photo array, and I looked at it from several different points of view, and I came to the same conclusion each time. It is not impermissibly suggestive in my view. I have seen photo arrays that have been upheld by the Supreme Court that were much more suggestive than that one. I don't think it's even close, and I cannot, therefore, grant the motion. I'm going to deny it." The defendant took exception to the court's ruling.

Our standard of review of a court's denial of a motion to suppress is well established. "[W]e will reverse the trial court's ruling [on evidence] only where there is abuse of discretion or where an injustice has occurred . . . and we will indulge in every reasonable presumption in favor of the trial court's ruling. . . . Because the inquiry into whether evidence of pretrial identification should be suppressed contemplates a series of fact-bound determinations, which a trial court is far better

equipped than this court to make, we will not disturb the findings of the trial court as to subordinate facts unless the record reveals clear and manifest error. . . . Because the issue of the reliability of an identification involves the constitutional rights of an accused . . . we are obliged to examine the record scrupulously to determine whether the facts found are adequately supported by the evidence and whether the court's ultimate inference of reliability was reasonable. . . .

"In determining whether identification procedures violate a defendant's due process rights, [t]he required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances. . . . An identification procedure is unnecessarily suggestive only if it gives rise to a very substantial likelihood of irreparable misidentification. . . . The defendant bears the burden of proving both that the identification procedures were unnecessarily suggestive and that the resulting identification was unreliable. . . . Generally, [t]he exclusion of evidence from the jury is . . . a drastic sanction, one that is limited to identification testimony which is manifestly suspect." (Citation omitted; internal quotation marks omitted.) *State* v. *Ortiz*, 252 Conn. 533, 552–53, 747 A.2d 487 (2000).

Here, the record does not reveal that the photographic array was unnecessarily suggestive. It is clear from the record that the police in no way highlighted or emphasized the defendant's photograph, nor did they in any manner verbally or demonstratively indicate anything to the witness that might be considered suggestive. Accordingly, the defendant failed to meet his

burden, and the trial court properly denied the defendant's motion to suppress.

The judgment is affirmed.

In this opinion the other judges concurred.