TYREESE BOWENS *v.* COMMISSIONER
OF CORRECTION
(SC 20204)

Robinson, C. J., and McDonald, D'Auria, Mullins, Kahn and Ecker, Js.

*Syllabus*

The petitioner, who had been convicted of murder, sought a writ of habeas corpus, claiming, inter alia, that he was actually innocent of the crime, the eyewitness identification procedures employed in connection with his criminal case violated his due process rights under the federal constitution, his first habeas counsel provided ineffective assistance of counsel, and his sentence for a crime he committed when he was a juvenile, without any consideration of the mitigating effects of his youth, violated the constitutional prohibition against cruel and unusual punishments. The murder occurred as the victim and another person, P, were sitting in the victim's parked car at a well illuminated intersection at around 11 p.m. P saw the shooter approach the car, lean into the driver's side window, and shoot the victim. The next day at the police station, P identified the petitioner's photograph from a photographic array, and the petitioner was arrested three days later. Two other witnesses, W and D, testified at the petitioner's criminal trial, corroborating P's description of the events, but they were unable to identify the petitioner as the shooter. D identified the petitioner in court as the man she had seen running on an adjacent street shortly after the shooting, entering the driveway of a house that the petitioner admitted staying at frequently at the time of the murder, and as a man she previously had seen in her neighborhood. In support of the alibi defense the petitioner presented at his criminal trial, he offered the testimony of three witnesses who claimed that he was with them at a party at C's home at the time of the shooting. H, an investigator retained by the petitioner's trial counsel, gave trial counsel a report summarizing an interview with C in which C indicated that the petitioner had been at the party. Trial counsel thereafter spoke with C twice during the petitioner's criminal trial but did not call her as a witness. The state nevertheless called C as a rebuttal witness, and she testified that she did not know the petitioner and had never seen him before. The petitioner's conviction was upheld on direct appeal. At the petitioner's first habeas trial, the habeas court denied his petition, in which he alleged that his trial counsel had rendered ineffective assistance of counsel. During the petitioner's second habeas trial, the petitioner presented the expert testimony of K, who testified regarding scientific research on the reliability of eyewitness identifications. K testified that several factors surrounding P's opportunity to observe the shooter could have undermined the reliability of P's identification and that the composition of the photographic array, as well as the procedures

333 Conn. 502 OCTOBER, 2019 503

Bowens *v.* Commissioner of Correction

surrounding P's viewing of the array, undermined the reliability of her selection of the petitioner's photograph. At the second habeas trial, the petitioner also presented the testimony of three witnesses who claimed that a third party, N, had made statements to them indicating the petitioner's innocence and implicating himself in the shooting, although they had never relayed this information to the police. Following the petitioner's second habeas trial, the habeas court rendered judgment denying the petition. On the granting of certification, the petitioner appealed. *Held*:

1. The habeas court properly denied the petitioner's claim of actual innocence, as the petitioner failed to sustain his burden of proving by clear and convincing evidence, in view of all of the evidence adduced at his criminal and habeas trials, that he was actually innocent of the victim's murder and that no reasonable fact finder would find him guilty of that crime: K's critique of P's eyewitness identification did not constitute affirmative proof of actual innocence, as P's testimony was not the only evidence linking the petitioner to the murder and was largely corroborated by another neutral, credible witness, W, and by D, whose testimony, if credited, would have severely undermined the petitioner's alibi defense by placing him near the crime scene shortly after the shooting; moreover, there were numerous, significant inconsistencies in the testimony of the petitioner's alibi witnesses, two of those alibi witnesses were not disinterested parties and, therefore, their stories may have been viewed with skepticism by the jury; furthermore, the habeas court's determination not to credit the testimony of the petitioner's third-party culpability witnesses was not clearly erroneous, as those witnesses failed to report N's confessions to law enforcement, N's reputation for veracity was subject to challenge by virtue of the witnesses' descriptions of N as "crazy," "under the influence," "paranoid," and as exhibiting bipolar behavior, and N's confession to one of those witnesses appeared to be inconsistent with P's account of how the victim spent the evening of the murder.

2. The habeas court correctly concluded that the identification procedures employed in connection with the petitioner's criminal case did not violate his due process rights: this court declined to consider the petitioner's contention that the photographic array from which P selected the petitioner's photograph was unnecessarily suggestive, as that claim had been adjudicated in the petitioner's direct appeal from his criminal conviction, and K's testimony that certain variables, such as poor viewing conditions and the stressful effects of suddenly confronting an armed assailant, undermined P's ability to recognize the perpetrator was not compelling, as the jury reasonably could have credited P's testimony that she had an adequate opportunity to observe the perpetrator in view of the fact that the crime scene had been well illuminated and the fact that P had several opportunities to observe the petitioner at close range before she saw that he was carrying a firearm; moreover, a review of the record did not bear out the petitioner's contention that he was

Bowens *v.* Commissioner of Correction

convicted solely on the basis of P's identification of him as the shooter, as the jury, considering the testimony of W and D together, reasonably could have concluded that the petitioner was the perpetrator.

3. The habeas court properly rejected the petitioner's claim that his habeas counsel had provided ineffective assistance at his first habeas trial by failing to challenge trial counsel's decision not to impeach C, as trial counsel's decision did not prejudice the petitioner's defense: the petitioner's failure to call C to testify at his second habeas trial made it impossible to know how she would have explained and reconciled her inconsistent statements to H, and, accordingly, it could not be determined how the jury at the petitioner's criminal trial would have weighed her statements; moreover, in light of other evidence admitted at the petitioner's criminal trial, there was no reason to believe that the jury would have viewed C's inability to recall meeting the petitioner as overly damaging to his alibi defense.

4. Even if the habeas court incorrectly concluded that the doctrine of res judicata barred it from resolving the merits of the petitioner's claim that it was cruel and unusual punishment for the trial court to have sentenced him to a term of imprisonment of fifty years for an offense he committed when he was seventeen years old without considering the mitigating effects of his youth pursuant to *Miller* v. *Alabama* (567 U.S. 460), and its progeny, he could not prevail on that claim, as this court rejected virtually identical claims in *State* v. *McCleese* (333 Conn. 378) and *State* v. *Williams-Bey* (333 Conn. 468), in which it held that parole eligibility under a recent legislative enactment (P.A. 15-84) was an adequate remedy under the state constitution, just as it is under the federal constitution, and that, because parole eligibility negates rather than cures a *Miller* violation, resentencing is not required.

(*One justice concurring in part and dissenting in part*)

Argued February 19—officially released October 22, 2019

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Sferrazza, J.*; judgment denying the petition, from which the petitioner, on the granting of certification, appealed. *Affirmed*.

*Katharine Goodbody*, assistant public defender, with whom was *Alexandra Harrington*, former deputy assistant public defender, for the appellant (petitioner).

*Timothy F. Costello*, assistant state's attorney, with whom, on the brief, were *Patrick J. Griffin*, state's

Bowens *v.* Commissioner of Correction

attorney, and *Rebecca A. Barry*, supervisory assistant
state's attorney, for the appellee (respondent).

*Opinion*

KAHN, J. The petitioner, Tyreese Bowens, appeals[1]
from the judgment of the habeas court denying his
second petition for a writ of habeas corpus challenging
a 1998 murder conviction. On appeal, the petitioner
claims, among other things, that the habeas court incor-
rectly concluded that (1) he did not establish by clear
and convincing evidence that he is actually innocent of
the murder, (2) the identification procedures employed
in his criminal case did not violate his due process
rights, (3) his first habeas counsel did not provide inef-
fective assistance of counsel, and (4) his cruel and
unusual punishment claims were barred by the doctrine
of res judicata. We affirm the judgment of the habeas
court.

On direct appeal, the Appellate Court briefly summa-
rized the facts of the case as follows: "On August 18,
1996, Kevin Hood, the victim, and [T'lara] Phelmetta
were riding around New Haven in [the victim's] car.
[Shortly after 11 p.m., they stopped in front of Mike's]
convenience store at the well lit intersection of Colum-
bus Avenue, Arch Street and Washington Avenue. [The
victim] made some purchases at the convenience store,
and, upon his return to the car, Phelmetta noticed a
man with a hooded jacket walking toward the car from
Washington Avenue. The man came up to the front
passenger seat window where she was seated and
peered through from about three feet away. She was
able to look closely at his facial features before he
turned away and walked around the back of the car,

[1] The petitioner, on the granting of certification, appealed from the judg-
ment of the habeas court to the Appellate Court, and we transferred the
appeal to this court pursuant to General Statutes § 51-199 (c) and Practice
Book § 65-1.

appearing to head away from the car. Suddenly, the man changed course and again approached the car. As he walked up to the driver's side, Phelmetta saw him withdraw a gun from underneath his shirt. The man leaned into [the victim's] open window and shot [him] several times. Phelmetta jumped out of the car through her window and fled to safety.

"Thereafter, officers from the New Haven [P]olice [D]epartment patrolling on Columbus Avenue came upon the victim. A few minutes later, Phelmetta returned to the scene and told a police detective that she had witnessed the shooting and gave a description of the shooter. The following day, on August 19, 1996, Phelmetta went to the police station, viewed a photographic array and identified the [petitioner] as the shooter." *State* v. *Bowens*, 62 Conn. App. 148, 149–50, 773 A.2d 977, cert. denied, 256 Conn. 907, 772 A.2d 600 (2001). The petitioner was arrested three days later on August 22, 1996.

In 1998, the case was tried to a jury, which found the petitioner guilty of murder, in violation of General Statutes (Rev. to 1995) § 53a-54a (a). The trial court rendered judgment in accordance with the verdict and sentenced the petitioner to a term of imprisonment of fifty years. The conviction was affirmed on direct appeal. Id., 149.

In 2004, the petitioner filed his first petition for a writ of habeas corpus, in which he alleged that his criminal trial counsel, Attorney Thomas J. Ullmann, had rendered ineffective assistance. Following a trial in 2005 (first habeas), the habeas court denied both the petition and the petitioner's petition for certification to appeal. See *Bowens* v. *Commissioner of Correction*, 104 Conn. App. 738, 936 A.2d 653 (2007) (dismissing appeal), cert. denied, 286 Conn. 905, 944 A.2d 978 (2008).

Bowens *v.* Commissioner of Correction

In 2017, the petitioner filed a second petition for a writ of habeas corpus, which is the subject of the present appeal. Following a habeas trial, the court denied the petition but granted the petitioner's petition for certification to appeal. See footnote 1 of this opinion. Additional facts and procedural history will be set forth as necessary.

I

The petitioner first contends that the habeas court incorrectly denied his claim that he is actually innocent of the victim's murder. He argues that the evidence presented at the two habeas trials, taken together with the evidence admitted at his criminal trial, establishes, clearly and convincingly, that he was actually innocent of the victim's murder. The respondent, the Commissioner of Correction, counters that the habeas court correctly concluded that (1) claims of actual innocence are only cognizable in the habeas context when founded on newly discovered evidence,[2] (2) much of the evidence presented by the petitioner at the habeas trial[3] was not newly discovered, (3) the petitioner's actual innocence claim is barred by the doctrine of res judicata, and (4) the petitioner failed to present sufficient affirmative proof to establish by clear and convincing evidence that he was actually innocent. We agree with the respondent's fourth point: even if we assume that the petitioner's claims were—or were not required to be—predicated on newly discovered evidence and, even if we assume that they were not barred by the doctrine of res judicata, the petitioner failed to sustain his burden of proving that he is actually innocent. For

_____

[2] On the respondent's motion, we permitted the parties to submit supplemental briefs to address the issue of whether newly discovered evidence is required to sustain a claim of actual innocence in the habeas context.

[3] Unless otherwise noted, all references to the habeas trial are to the petitioner's second habeas trial, which is the subject of the present appeal.

Bowens *v.* Commissioner of Correction

that reason, we need not address the other arguments presented by the respondent.

A

Additional Facts

The following additional facts, which the habeas court found or the jury reasonably could have found; see, e.g., *Miller* v. *Commissioner of Correction*, 242 Conn. 745, 748, 700 A.2d 1108 (1997); are relevant to the petitioner's actual innocence claim. Three interrelated factual questions dominated the petitioner's criminal and habeas trials: (1) whether eyewitnesses accurately identified the petitioner as the shooter; (2) whether he presented a believable alibi defense covering the time period when the murder occurred; and (3) whether a different individual, namely, the petitioner's cousin, Tyshan Napoleon, was the actual perpetrator. Each of these questions bears on the petitioner's actual innocence claim.

1

Eyewitness Testimony

At the time of the shooting, the victim's car was parked on the north side of Columbus Avenue, facing west, and just west of the Arch Street intersection, in front of what was known as Mike's convenience store. As we discussed, the state's case against the petitioner centered around the testimony of the victim's date, Phelmetta. She testified at the criminal trial that she observed the shooter as he crossed Columbus Avenue and walked up the street toward the passenger side of the vehicle where she was seated. The shooter drew her attention as he approached because, although "it was pretty warm that day," he was wearing a hooded sweatshirt (hoodie) with the hood up. Phelmetta watched the shooter walk approximately three feet up the sidewalk, peer at her and the victim through the passenger side window, circle back around the rear of

Bowens *v.* Commissioner of Correction

the car, step into the street, quickly approach the car from the driver's side, pull a pistol from under his hoodie, lean into the open driver's window where the victim was seated, and begin firing at close range into the victim's chest. At that point, Phelmetta jumped out of the open car window and fled up Arch Street as she heard additional shots fired. In all, she recalled hearing approximately seven shots fired.

Phelmetta also testified that she was able to observe the shooter's face and features as he initially approached the car from the driver's side, as he looked at her through the passenger side window, and as he approached the victim's side of the car. She described the shooter as a young, dark complexioned black male, approximately five feet nine inches, with squinty eyes, a wide nose, and full lips. The day following the shooting, Phelmetta identified the petitioner as the shooter from a photographic array.[4] She also identified the petitioner in court as the shooter.

The state also called two additional witnesses who, although unable to identify the petitioner as the shooter, provided testimony that largely corroborated that of Phelmetta. The first, Daniel Newell, was a local resident who had just parked on the west side of Arch Street, at, and facing, the intersection with Columbus Avenue, when the shooting occurred. He testified that he saw a young black male wearing a hoodie cross Columbus Avenue from Washington Avenue and approach the victim's parked car from behind. He then heard shots and saw sparks coming out of the car as the young man stood at the driver's window. Newell then heard a young lady scream and saw her exit the passenger side of the car, without opening the door, and run past his car

_____

[4] The trial court denied the petitioner's motion to suppress Phelmetta's identification, ruling that the identification procedure was not unnecessarily suggestive, and the Appellate Court upheld that ruling on direct appeal. *State* v. *Bowens*, supra, 62 Conn. App. 157–61.

Bowens *v.* Commissioner of Correction

along Arch Street. After a couple more shots were fired, Newell saw the young man walk back across the street toward Washington Avenue and Frank Street, where he spoke with a young Hispanic looking male. A short time later, as Newell drove along Frank Street from the other direction, he saw the same young black man in the hoodie running or preparing to run down Frank Street, away from the crime scene. Finally, Newell testified that, although the intersection at Arch Street and Columbus Avenue was well lit, he did not pay close attention to the shooter's facial features.

Next, another local resident, Hilda Diaz, testified that she was in her apartment on Frank Street at the time of the shooting when she heard gunfire. She looked out of her window and saw two young men—one black, one with a lighter complexion—running down the street. The men separated, and she watched the black man run up a driveway that went behind a yellow house across the street from her.

Diaz believed that she recognized the young black male as a man whom she previously had seen frequenting the yellow house. Diaz testified that the black male "had his hair wild, standing up," just like the man whom she previously had seen on her street. She stated: "I said to myself . . . it looks like the guy. I know him." Although Diaz admitted that she did not see the man's face as he ran by, she repeatedly stated that she recognized him from his "wild" hair style. In court, Diaz identified the petitioner as the man whom she saw running on Frank Street after the shooting and whom she previously had seen in her neighborhood, although she noted that his hair was styled differently at the time of trial.[5]

---

[5] The petitioner's mother, Alice Buie, and his cousin, Tychiah Harrison, both confirmed that, in the summer of 1996, the petitioner lived at or regularly visited and stayed at a house at 24-26 Frank Street that Buie's family owned. The petitioner himself admitted to having stayed at that location two to three times per week in August, 1996.

Bowens *v.* Commissioner of Correction

During the second habeas trial, the petitioner presented the expert testimony of Margaret Kovera, a professor of social psychology. Kovera testified regarding scientific research on the reliability of eyewitness identifications. She explained that studies have found that various factors may undermine the reliability of eyewitness identifications and that those factors may be counterintuitive to the average juror. Consequently, Kovera opined, expert testimony on the factors that impact the reliability of eyewitness identifications can sensitize jurors to those factors and help jurors to make decisions that reflect the types of variations in accuracy that have been observed through research.

Kovera then testified that she had reviewed the circumstances surrounding Phelmetta's opportunity to observe the shooter, as well as the procedures used to obtain her identification of the petitioner from a photographic array and, subsequently, in court. Kovera opined that several "estimator factors" could have undermined the reliability of Phelmetta's identification. These included the presence of a weapon, the stress Phelmetta was under at the time of the shooting, that the shooter was wearing a hoodie that could have disguised his hairline, that the shooting took place at night, and that Phelmetta had a relatively short period of time in which to observe the shooter.

Kovera also noted the presence of various "system variables" that could have undermined the accuracy of the identification. She opined that the composition of the photograph array, as well as the procedures surrounding Phelmetta's viewing of the array, undermined the reliability of her identification. With respect to the array itself, Kovera observed that many of the eight included photographs were "fillers" that did not look like the petitioner or closely match Phelmetta's description of the shooter. For example, the photograph of the petitioner was one of only two photographs that

Bowens *v.* Commissioner of Correction

depicted individuals wearing hooded sweatshirts, one of only two photographs that depicted individuals with "puffy" or "pudgy" eyes, and one of only three photographs that had a yellow or sepia tone that caused them to "pop out from the other pictures." She also noted that not all of the photographs depicted individuals with broad noses and dark complexions.

Kovera also noted that the police officers brought Phelmetta to the police station to make the identification, that they did not utilize a double-blind procedure, and that there was no indication that the administering officer ever advised her that the perpetrator might not be depicted in the array. As a result, Kovera concluded, Phelmetta might have surmised that the police had the shooter in custody, that his picture was included in the array, and that she could identify it simply by the process of eliminating those photographs that were inconsistent with her recollection. Kovera also opined that it was poor police procedure, and potentially biasing, for the police officers to have shown Phelmetta a second photographic array containing the petitioner's picture just prior to her in-court identification of him at trial.

Finally, Kovera testified regarding Diaz' testimony that she recognized the man she saw running on Frank Street after the shooting as the petitioner because of his distinctive hair style. Kovera opined that the fact that Diaz observed the subject at night, from a distance, and while he was running and wearing a hoodie all could have impacted the reliability of her recognition of the petitioner. Kovera also assumed that Diaz' identification was a cross-racial identification, which, Kovera opined, was "problematic in that there's a very significant body of literature showing that people make more mistakes when identifying somebody of another race than they do of their own."

Bowens *v.* Commissioner of Correction

The petitioner characterized Kovera's testimony as newly discovered evidence. In support of that position, Kovera testified that, although the first scientific studies of the reliability of eyewitness identifications were conducted in the late 1970s, it was not until the late 1980s or early 1990s that discussion began regarding whether scholars in her field could provide expert testimony in criminal trials. She stated that the "solidification" of the role of science in identifications occurred with the publication of a white paper by the American Psychology Law Society in 1998 but that eyewitness identification experts were not used in Connecticut's trial courts until 2012. She also highlighted some "really recent" research into the conditions under which the confidence of an eyewitness identification correlates with accuracy. Finally, she opined that her report would have assisted the jury in weighing the eyewitness testimony in the petitioner's criminal case.

In support of his actual innocence claim, the petitioner argued that new science, encapsulated in Kovera's testimony, established that his conviction had been obtained solely on the basis of an unreliable eyewitness identification. In rejecting this claim, the habeas court ruled that (1) affirmative evidence of actual innocence necessary to support a habeas claim must be newly discovered, (2) Kovera's testimony was not newly discovered evidence; rather, it was a change in the rules of evidence that permitted the petitioner to proffer testimony regarding the reliability of eyewitness identification that he could not have introduced at his 1998 trial, and (3) in any event, Kovera's testimony, if credited, did not qualify as affirmative proof of the petitioner's innocence but, rather, merely weakened the state's case by casting doubt on the reliability of their star witness. The petitioner challenges all three conclusions on appeal.

2

### Alibi Defense

The relevant facts regarding the petitioner's alibi defense are set forth in full in part III A of this opinion. In brief, the victim was killed at approximately 11:18 p.m. on August 18, 1996. The petitioner testified that he left his mother's house in Hamden at approximately 10 p.m., travelled by taxicab with his friend, Celena Jackson, to her cousin's birthday celebration in the Fair Haven section of New Haven, and then left Fair Haven by taxicab after midnight, returning to Hamden with Jackson around 1 a.m. Jackson's testimony largely mirrored that of the petitioner, and two of the other three adults who were allegedly at the celebration, her cousins Turquoise Cox and Stacy Bethea, also confirmed that the petitioner was with them on the night of the murder. The other attendee, Jackson's cousin, Crystal Bethea, did not recall the petitioner being present or ever having met him previously.

The habeas court did not discuss the petitioner's alibi at length. The court did note, however, that Diaz' testimony, if credited by the jury, placed the petitioner in the vicinity of the murder just moments after it occurred and, therefore, undercut his alibi defense.

3

### Third-Party Culpability

In both of his habeas actions, the petitioner contended not only that he was in Fair Haven at the time of the murder but also that he could identify the actual shooter: his cousin, Napoleon. The first habeas action was filed in 2003 and tried in mid-2005, a few months after Napoleon died in a shoot-out with the police. In that petition, the petitioner contended that "Napoleon was and is the person who killed [the victim] . . . ." At trial, however, his habeas counsel, Attorney Frank

Bowens *v.* Commissioner of Correction

Cannatelli, conceded that the petitioner was unable to establish at that time that any specific third party had committed the crime.

In his second habeas petition, the petitioner again contended that he was actually innocent of the victim's murder. At his habeas trial, he produced, for the first time, three witnesses, each of whom testified that, prior to his death, Napoleon had confessed to the crime and lamented that the petitioner had been wrongly convicted. Those witnesses were Joseph Burns, Napoleon's former coworker, roommate, and childhood friend; Tychiah Harrison, Burns' ex-wife and a cousin of both the petitioner and Napoleon; and Amika Collins, a childhood friend of the petitioner and the mother of Napoleon's child.

Burns testified that, at some point in 2000, he offered a ride to Napoleon, who seemed to be angry and upset. When Burns asked what was wrong, Napoleon replied that he was thinking about the petitioner, who was in prison. Napoleon stated that the petitioner "really shouldn't be there" and elaborated that, "I did that shit, man. I did that shit. He shouldn't . . . be there." When Burns asked Napoleon how he could allow the petitioner to "go down for this," Napoleon replied, "I ain't going back to jail."

Burns conceded that he never reported this conversation to the police, explaining that "[w]e don't believe in going to the police." He also stated that he feared Napoleon would retaliate had he gone to the authorities.

Harrison testified that, in 1996, Napoleon was living on Frank Street in New Haven. She recalled that his moods were often "high and low" and he seemed to be angry and "under the influence." She had seen him in possession of a gun on a number of occasions, and she knew that he was selling drugs and had weapons at that time.

Later, on one occasion in 2001 or 2002, Napoleon showed up unannounced at Harrison's North Branford home. He was crying and told Harrison and her husband, Doug, "[T]his shit is killing me. I need someone to talk to. You know Tyreese didn't kill that dude. . . . Tyreese couldn't have done that. That, that wasn't Tyreese. He wasn't about that life." Napoleon then admitted: "[I]t was me."

Harrison also related a second conversation with Napoleon that occurred several weeks after the first. Napoleon had again appeared at Harrison's home and told her that the petitioner had been "across town with his girl," presumably at the time of the murder. She also testified that Napoleon indicated, with respect to some unspecified date, possibly the date of the murder, that "that dude came over here, he came over here," and "I had to run and get my piece, and I ran off the porch after him."

Harrison conceded that she did not report Napoleon's statements to the police, despite knowing that the petitioner was incarcerated, because she did not think the police could do anything. She claimed, however, that she told her grandmother, Irene Johnson, whom she believed would know the appropriate people to notify, as well as her Aunt Thelma.

Harrison's characterizations of Napoleon, however, were inconsistent with eyewitnesses' descriptions of the shooter. Harrison testified that, in 1996, Napoleon "didn't really have too much hair" and that it was "very, very short to his scalp and like he was losing his hair on top. Like it was like fading. It was very, very thin." She also described Napoleon as light skinned, for a person of color. In addition, she characterized his demeanor when making his confession as "paranoid" and "[under] [t]he influence or just crazy . . . [m]aybe both . . . ."

Bowens *v.* Commissioner of Correction

Finally, Collins testified that, in late 2004, Napoleon told her that he "[g]ets away with a lot of things that he's done, that his cousin was locked up for something that he did, just because his name was Ty." Napoleon reiterated, "they got the wrong Ty." Collins admitted that she never told anyone what Napoleon had said, even though she knew that the petitioner was in prison. She claimed that she was afraid of Napoleon and was testifying at the habeas trial only because he was dead.

With respect to the third-party culpability testimony, the habeas court found as follows: "Despite being related to the petitioner by blood or marriage and having occasionally lived in the same house where the petitioner and . . . Napoleon sometimes resided, none of the three witnesses who testified at the present habeas trial that Napoleon implicated himself as the real shooter came forward with this information until after Napoleon's tragic death some years after the petitioner's criminal trial. In order to credit the testimony of [Burns], Harrison, and Collins, a fact finder would have to believe that these three individuals, all of whom were well aware [of] the petitioner's plight, chose to ignore the grievous injustice suffered by their kin for years while he languished in prison.

"As noted above, the revelations of these witnesses about . . . Napoleon were withheld until after Napoleon's unfortunate demise. The surfacing of these accusations only after Napoleon could no longer be called to account taints their testimony with the scent of fabrication to benefit the petitioner. One can argue that these witnesses delayed reporting the conversations with . . . Napoleon, which exonerated the petitioner, for fear of these reports leading to Napoleon's arrest. Napoleon was also a relative of the witnesses. However, clear and convincing proof is more exacting than that sufficient to establish a probability of actual innocence. Clear and convincing evidence is substantial and

unequivocal evidence that demonstrates a very high probability that the fact to be proven is true . . . .

"It is at least equally persuasive that these witnesses took advantage of Napoleon's earthly departure as a convenient occasion to cast false blame on him to rescue the petitioner from his fate as it is to believe that these witnesses allowed the petitioner to sit in prison for years for a crime of which they knew he was innocent. The equivocal motivations for the witnesses' belated revelations fail to convince the court, by clear and convincing evidence, that the petitioner is factually innocent of [the victim's] murder [or] that no reasonable fact finder would convict the petitioner of that crime after consideration of a combination of the evidence adduced at both the criminal trial and the habeas proceedings . . . ." (Citations omitted.)

B

Governing Law

Habeas corpus relief in the form of a new trial on the basis of a claim of actual innocence requires that the petitioner satisfy the two criteria set forth in *Miller* v. *Commissioner of Correction*, supra, 242 Conn. 747. Under *Miller*, "the petitioner [first] must establish by clear and convincing evidence that, taking into account all of the evidence—both the evidence adduced at the original criminal trial and the evidence adduced at the habeas corpus trial—he is actually innocent of the crime of which he stands convicted. Second, the petitioner must also establish that, after considering all of that evidence and the inferences drawn therefrom as the habeas court did, no reasonable fact finder would find the petitioner guilty of the crime." Id.

As to the first prong, we emphasized in *Miller* that "the clear and convincing standard . . . is a very demanding standard and should be understood as such,

Bowens *v.* Commissioner of Correction

particularly when applied to a habeas claim of actual innocence, where the stakes are so important for both the petitioner and the state. . . . [That standard] should operate as a weighty caution upon the minds of all judges, and it forbids relief whenever the evidence is loose, equivocal or contradictory. . . . [The standard requires] extraordinarily high and truly persuasive demonstration[s] of actual innocence.'' (Citations omitted; internal quotation marks omitted.) Id., 795.

Moreover, "actual innocence [must be] demonstrated by *affirmative proof* that the petitioner did not commit the crime." (Emphasis added.) *Gould* v. *Commissioner of Correction*, 301 Conn. 544, 561, 22 A.3d 1196 (2011). "Affirmative proof of actual innocence is that which might tend to establish that the petitioner could not have committed the crime . . . that a third party committed the crime, or that no crime actually occurred." (Emphasis omitted.). Id., 563. "Clear and convincing proof of actual innocence does not, however, require the petitioner to establish that his or her guilt is a factual impossibility." Id., 564. In part for these reasons, we emphasized in *Miller* that "truly persuasive demonstrations of actual innocence after conviction in a fair trial have been, and are likely to remain, extremely rare." (Internal quotation marks omitted.) *Miller* v. *Commissioner of Correction*, supra, 242 Conn. 805–806.

C

Analysis

1

With respect to Kovera's expert testimony, we agree with the conclusion of the habeas court that, as a matter of law, Kovera's critique of Phelmetta's eyewitness identification did not constitute affirmative proof of actual innocence. The court explained that "[a] more vigorous attack on the witnesses' acumen and memory when

Bowens *v.* Commissioner of Correction

identifying the petitioner as the perpetrator only weakens the prosecution case rather than [tending] to establish that the petitioner could not have committed the crime . . . . Simply casting doubt on the reliability of a state's witness, even a star witness, fails to qualify as affirmative proof of innocence . . . .'' (Citation omitted; emphasis omitted.) In other words, the fact that an identification is made under less than ideal conditions, even conditions that render it highly suspect, does not mean that the identification is *necessarily* inaccurate or that no reasonable jury could credit it.[6] If that were the case, then many convictions obtained on the basis of eyewitness testimony would have to be nullified.

The habeas court also observed that, as a factual matter, Phelmetta's testimony was not the only evidence tending to link the petitioner to the crime. Rather, her account of events was largely corroborated by that of another neutral, credible witness, namely, Newell. In addition, Diaz testified that an individual, whose hair she recognized as that of the petitioner, ran behind a house that the petitioner tended to frequent, mere moments after the shooting occurred nearby, and at a

---

[6] See, e.g., *Cook* v. *Ohio*, Docket No. 2:15-cv-02669, 2016 WL 374461, *10 (S.D. Ohio February 1, 2016), report and recommendation adopted and affirmed, 2016 WL 770998 (S.D. Ohio February 29, 2016); *Hale* v. *McDonald*, Docket No. ED CV 09-00570-DMG (VBK), 2010 WL 4630268, *16 (C.D. Cal. July 30, 2010), report and recommendation accepted and adopted, 2010 WL 4628056 (C.D. Cal. November 8, 2010), aff'd sub nom. *Hale* v. *Cate*, 530 Fed. Appx. 636 (9th Cir. 2013); *Coleman* v. *Thompson*, 798 F. Supp. 1209, 1216–17 (W.D. Va.), aff'd, 966 F.2d 1441 (4th Cir.), cert. denied, 504 U.S. 992, 112 S. Ct. 2983, 119 L. Ed. 2d 600 (1992); see also *Carriger* v. *Stewart*, 132 F.3d 463, 477 (9th Cir. 1997) (''[a]lthough the postconviction evidence [that the petitioner] presents casts a vast shadow of doubt over the reliability of his conviction, nearly all of it serves only to undercut the evidence presented at trial, not affirmatively to prove [his] innocence''), cert. denied, 523 U.S. 1133, 118 S. Ct. 1827, 140 L. Ed. 2d 963 (1998); G. Weiss, ''Prosecutorial Accountability After *Connick* v. *Thompson*,'' 60 Drake L. Rev. 199, 242 (2011) (''evidence that challenges the credibility of a witness for the prosecution is of a different category than true *Brady* [v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 194, 10 L. Ed. 2d 215 (1963)] material, which tends to show the actual innocence of the criminal defendant'' [footnote omitted]).

Bowens *v.* Commissioner of Correction

time when the petitioner claimed to have been across town in Fair Haven. So, although Diaz could not link the petitioner directly to the shooting, her identification, if credited, would have severely undermined his alibi defense.[7]

Indeed, the fact that the petitioner took the stand and offered an alibi defense at his criminal trial made Diaz' testimony especially damaging. As Michael Sheehan, the petitioner's criminal defense expert, testified at the habeas trial, presenting a weak, implausible, or easily rebutted alibi is an especially risky defense strategy. Although a defendant always enjoys the presumption of innocence, "it is generally acknowledged that an attempt to create a false alibi constitutes evidence of the defendant's consciousness of guilt." (Internal quotation marks omitted.) *Skakel* v. *Commissioner of Correction*, 329 Conn. 1, 64, 188 A.3d 1 (2018), cert. denied, U.S. , 139 S. Ct. 788, 202 L. Ed. 2d 569 (2019).

In the present case, it was not only Diaz' testimony and the fact that Crystal Bethea did not recall the petitioner having attended Cox' birthday celebration that might have led the jury to question the veracity of the petitioner's story. During his closing argument, the prosecutor pointed to the numerous, significant inconsistencies in the testimony of the petitioner's alibi witnesses as evidence that they had fabricated the alibi story. He also emphasized that the petitioner himself admitted to having briefly left Cox' celebration, ostensibly to "walk around the projects"; no one was able to verify where the petitioner went during that period or how

_____

[7] The petitioner contends that Diaz never actually identified him as the individual whom she saw on Frank Street after the shooting but, rather, merely noted a resemblance between the men. The jury, however, reasonably could have interpreted Diaz' testimony that, "I said to myself . . . it looks like the guy. I know him," together with her identification of the petitioner at trial, as a positive identification.

Bowens *v.* Commissioner of Correction

long he was gone.[8] Moreover, Sheehan, the petitioner's own expert, conceded that the petitioner's two principal alibi witnesses, Jackson and Cox, were not disinterested parties, and, therefore, their stories might have been viewed with skepticism by the jury.[9]

For these reasons, we conclude that there is substantial evidence to support the habeas court's determination that the petitioner failed to establish by clear and convincing evidence that he is actually innocent of the charged crime. See *Miller* v. *Commissioner of Correction*, supra, 242 Conn. 803 (defining standard of review). For essentially the same reasons; see *Gould* v. *Commissioner of Correction*, supra, 301 Conn. 559 n.14; we conclude that the petitioner also failed to satisfy the second prong of *Miller*, namely, to demonstrate that no reasonable jury with knowledge of the evidence presented at the habeas trial would have found him guilty beyond a reasonable doubt. See *Miller* v. *Commissioner of Correction*, supra, 747. At the end of the day, the jury, in order to find the petitioner guilty, must have determined that the eyewitness testimony of Phelmetta and Diaz, as linked and corroborated by Newell's testimony, was substantially more credible than that of the petitioner and his alibi witnesses.[10] It is certainly

[8] The prosecutor also highlighted other aspects of the petitioner's testimony that lacked credibility, such as his bizarre statements that, even though he was living alone several days each week at the house on Frank Street and already had a child of his own, he was bound by a self-imposed "curfew" and so rarely went out in the evenings.

[9] Jackson testified that she was a close friend of the petitioner's and that he had dated Cox for a while.

[10] The petitioner takes issue with the habeas court's statement that "[t]he sequence of events surrounding the shooting of the victim described by . . . Phelmetta [was] unassailable." The petitioner contends that this determination is clearly erroneous because (1) Kovera's testimony called into question Phelmetta's ability to accurately perceive and recall the events surrounding the murder, and (2) Newell described the events immediately preceding the shooting as having transpired much more quickly than did Phelmetta, and without the shooter having first peered into her side of the car, which could suggest that Phelmetta had less of an opportunity to observe the shooter than she indicated at trial. The habeas court did not determine,

Bowens *v.* Commissioner of Correction

possible that, had it been given the opportunity to filter
the testimony of the state's witnesses through the lens
of Kovera's critique, the jury would have weighed the
competing stories differently and come to a different
conclusion. But we are not prepared to say, on this
record, that no reasonable jury, having heard Kovera's
testimony, could nevertheless find the petitioner guilty
beyond a reasonable doubt. Accordingly, even assum-
ing, for the sake of argument, that Kovera's testimony
constituted new evidence, we are not persuaded that,
if credited, it would have constituted affirmative proof
of the petitioner's actual innocence.

2

We also are not prepared to gainsay the habeas
court's determination that the petitioner failed to prove
by clear and convincing evidence that Napoleon was the
actual perpetrator. Although the court did not expressly
state that the petitioner's third-party culpability wit-
nesses—Burns, Harrison, and Collins—lacked credibil-
ity, the court's determination that their testimony was
tainted "with the scent of fabrication" was tantamount
to such a finding. Because the habeas court is the sole
arbiter of the credibility of witnesses and the weight
to be given to their testimony, we must defer to that
finding.[11] See, e.g., *Sanchez* v. *Commissioner of Correc-
tion*, 314 Conn. 585, 604, 103 A.3d 954 (2014).

however, that Phelmetta's *identification* of the petitioner was unassailable.
We take the court's point simply to be that the overall sequence of events
that the jury reasonably could have found—a man wearing a hoodie
approached the car from across Columbus Avenue, walked up to the victim's
window, fired point blank into the car, crossed back onto Washington Street,
and was seen fleeing on Frank Street a few minutes later—is generally
consistent with the testimony of Phelmetta, Newell and Diaz, each of whom
was an unbiased observer.

[11] For the same reason, we are not persuaded by the petitioner's argument
that the habeas court gave insufficient credence to the testimony of those
witnesses that they did not notify law enforcement of Napoleon's confessions
for fear that he would retaliate. Of course, the court may have discounted
that testimony because none of the witnesses came forward to clear the
petitioner's name even after Napoleon died, or for twelve years thereafter.

Bowens *v.* Commissioner of Correction

Moreover, even if we were to construe the habeas court's determination as a legal, rather than factual, conclusion, there is ample authority for the court's conclusion that a witness' failure to report a purported third-party confession to law enforcement calls his or her credibility into question. See, e.g., *State* v. *Bryant*, 202 Conn. 676, 703, 523 A.2d 451 (1987) (friends or acquaintances of defendant may be expected to convey exculpatory information to police); *Moye* v. *Warden*, Docket No. CV-09-4003191, 2012 WL 3006297, *3 (Conn. Super. June 22, 2012) (same), aff'd sub nom. *Moye* v. *Commissioner of Correction*, 147 Conn. App. 325, 81 A.3d 1222 (2013), aff'd, 316 Conn. 779, 114 A.3d 925 (2015); *State* v. *Sands*, 123 N.H. 570, 612, 467 A.2d 202 (1983) (noting cases from other jurisdictions).

Nevertheless, the petitioner contends that the habeas court's findings with respect to the third-party culpability testimony of Burns, Harrison, and Collins are clearly erroneous because those findings rest on an inaccurate understanding of the relationship between the witnesses, Napoleon, and the petitioner. Specifically, the habeas court opined that it was especially implausible that those witnesses would permit the petitioner to languish unjustly in prison when they were "related to the petitioner by blood or marriage and . . . occasionally lived in the same house [on Frank Street] where the petitioner . . . sometimes resided . . . ." The petitioner argues that only Harrison, the petitioner's cousin, was his kin, and that only Burns ever resided with the petitioner on Frank Street.

This, however, ignores the fact that Burns also was essentially family to the petitioner, having lived with him when the two were children and having dated Harrison in high school and married her in 2010.[12] Of the petitioner's cousin Napoleon, Burns testified, "that's my

_____

[12] The two were no longer married at the time of the habeas trial in 2017.

Bowens *v.* Commissioner of Correction

extended family. I'm actually closer to his family, than I am to my own.'' And of the petitioner himself, Burns volunteered that ''we were all close. We was like fingers in the same hand.'' For her part, Collins was a childhood friend of the petitioner and, while she was never married to Napoleon, did reside with and have a daughter with him.

The record reveals a number of reasons why the habeas court may have declined to credit the petitioner's witnesses. First, Burns and Harrison were married for some unspecified period of time while the petitioner was incarcerated, beginning in 2010. Harrison, however, testified that she related Napoleon's confessions only to her grandmother and her great aunt, whereas Burns stated that he had never shared Napoleon's confession with anyone else. The habeas court reasonably could have found it to be improbable that the couple, both of whom had known the petitioner since childhood and both of whom had been close compatriots of Napoleon over the years, would never once during their married life have compared notes on the topic or remarked that the petitioner was serving time for Napoleon's crime.

Second, even if one takes the confession testimony at face value, Napoleon's reputation for veracity was subject to challenge. The witnesses variously described Napoleon as ''crazy,'' ''under the influence,'' ''paranoid,'' and exhibiting bipolar behavior. And Napoleon's confession to Harrison that he chased the victim off of his porch on Frank Street, presumably just before the murder, appears to be inconsistent with Phelmetta's account of how she and the victim spent the evening in question. For these reasons, we conclude that the habeas court's decision not to credit the testimony of Burns, Harrison, and Collins was not clearly erroneous and that court's determination that the petitioner failed to establish his actual innocence by clear and convincing evidence was not incorrect.

Bowens *v.* Commissioner of Correction

## II

The petitioner's second claim also revolves around Kovera's expert testimony as to the questionable reliability of eyewitness identifications. The petitioner contends that he was convicted solely on the basis of Phelmetta's identification of him as the shooter and that that identification was so unreliable as to violate his constitutional right to due process of law.[13] We are not persuaded.

## A

A due process challenge to an eyewitness identification presents a mixed question of law and fact that we review de novo. See, e.g., *State* v. *Marquez*, 291 Conn. 122, 137, 967 A.2d 56, cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009). Although we must defer to any factual findings of the habeas court in this regard, we do so only after conducting a scrupulous examination of the record to ascertain whether those findings are supported by substantial evidence. See id.

The following well established principles guide our resolution of this issue. The due process clause of the fourteenth amendment has been construed to bar, in a criminal prosecution, the admission of evidence deriving from unnecessarily suggestive identification procedures. See *Neil* v. *Biggers*, 409 U.S. 188, 196, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972). In applying this protection, "each case must be considered on its own facts, and . . . convictions based on eyewitness identifica-

_____

[13] In his habeas petition, the petitioner alleged violations of his due process rights under both the fourteenth amendment to the United States constitution and article first, §§ 8 and 9, of the constitution of Connecticut. However, because the petitioner has neither briefed the state constitutional question nor presented any argument as to why article first, §§ 8 and 9, affords broader protection than its federal counterpart, we limit our analysis to the petitioner's rights under the fourteenth amendment. See, e.g., *State* v. *Delgado*, 323 Conn. 801, 805 n.4, 151 A.3d 345 (2016); *State* v. *Gonzalez*, 278 Conn. 341, 347 n.9, 898 A.2d 149 (2006).

Bowens *v.* Commissioner of Correction

tion at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'' (Internal quotation marks omitted.) Id., 196–97. ''But if the indicia of reliability are strong enough to outweigh the corrupting effect of the [police arranged] suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth.'' *Perry* v. *New Hampshire*, 565 U.S. 228, 232, 132 S. Ct. 716, 181 L. Ed. 2d 694 (2012).

Moreover, when police misconduct or other state action is not implicated, and the challenge is simply to the reliability of the identification itself, the United States Supreme Court has made clear that the federal constitution ''protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting [the] introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit.'' Id., 237. As that court further explained in *Perry*, ''the potential unreliability of a type of evidence does not alone render its introduction at the defendant's trial fundamentally unfair. . . . The fallibility of eyewitness evidence does not, without the taint of improper state conduct, warrant a due process rule requiring a trial court to screen such evidence for reliability before allowing the jury to assess its creditworthiness.'' (Citations omitted.) Id., 245.

The Supreme Court explained its reasons for rejecting ''a broadly applicable due process check on eyewitness identifications . . . . [The] unwillingness to enlarge the domain of due process . . . rests, in large part, on our recognition that the jury, not the judge, traditionally determines the reliability of evidence. . . . We also take account of other safeguards built into our

Bowens *v.* Commissioner of Correction

adversary system that caution juries against placing undue weight on eyewitness testimony of questionable reliability. These protections include the defendant's [s]ixth [a]mendment right to confront the eyewitness . . . the defendant's right to the effective assistance of an attorney, who can expose the flaws in the eyewitness' testimony during cross-examination and focus the jury's attention on the fallibility of such testimony during opening and closing arguments [and] [e]yewitness-specific jury instructions, which . . . likewise warn the jury to take care in appraising identification evidence. . . . The constitutional requirement that the government prove the defendant's guilt beyond a reasonable doubt also impedes convictions based on dubious identification evidence." (Citations omitted; footnote omitted.) Id., 244–47. Accordingly, "[w]hen no improper law enforcement activity is involved . . . it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt." Id., 233.

B

With these principles in mind, we turn our attention to Kovera's testimony suggesting that the identification procedures used in the present case were unnecessarily suggestive. Relying on Kovera's testimony, the petitioner appears to allege that both system variables, such as the officers' use of an unnecessarily suggestive photographic array, and estimator variables, such as poor visibility, a short exposure duration, and the fear inspiring presence of a firearm, fatally undermined Phelmetta's ability to identify the perpetrator.

We decline to consider the petitioner's first contention, that system variables rendered the photographic

array from which Phelmetta selected him unnecessarily suggestive, because essentially the same claim was adjudicated in the petitioner's direct appeal. See, e.g., *Carpenter* v. *Commissioner of Correction*, 274 Conn. 834, 845 n.8, 878 A.2d 1088 (2005) ("if an issue was litigated on appeal, the petitioner is not entitled to bring a habeas petition challenging the outcome of the appeal" [emphasis omitted]). Specifically, the Appellate Court considered and rejected the petitioner's argument that the array was unnecessarily suggestive because only two of the eight photographs depicted individuals wearing hoodies and because the array included pictures of light skinned males who did not have the facial features that Phelmetta had described. See *State* v. *Bowens*, supra, 62 Conn. App. 158–61. The fact that Kovera discussed certain other obvious factors, such as that the petitioner's photograph was one of several photographs in the array that had a yellowish hue, does not permit him to relitigate the claim in this habeas action.

With respect to the issue of whether estimator variables, such as poor viewing conditions and the stressful effects of suddenly confronting an armed assailant, rendered Phelmetta's identification so unreliable as to violate the petitioner's fourteenth amendment rights, the United States Supreme Court in *Perry* specifically rejected the theory that factors of this sort that cast doubt on the trustworthiness of an eyewitness identification constitute a due process violation: "[Many] factors bear on the likelihood of misidentification . . . for example, the passage of time between exposure to and identification of the defendant, whether the witness was under stress when he [or she] first encountered the suspect, how much time the witness had to observe the suspect, how far the witness was from the suspect, whether the suspect carried a weapon, and the race of the suspect and the witness. . . . To embrace [the

Bowens *v.* Commissioner of Correction

petitioner's] view would thus entail a vast enlargement of the reach of due process as a constraint on the admission of evidence.'' (Citations omitted; internal quotation marks omitted.) *Perry* v. *New Hampshire*, supra, 565 U.S. 243–44.

We further note that Kovera's testimony that estimator variables undermined Phelmetta's ability to recognize the perpetrator was not especially compelling in light of the evidence presented at trial. Several witnesses testified that the intersection where the crime occurred was well lit. Phelmetta testified that she had several opportunities to observe the perpetrator at close range, before she saw that he was carrying a firearm and before she became aware that he posed any threat. There also is no indication in the record that Phelmetta is of a different race than the petitioner. Although there were certain minor inconsistencies between Phelmetta's trial testimony, the testimony of other witnesses, and Phelmetta's prior statements to the police, the jury reasonably could have credited her trial testimony that she had an adequate opportunity to observe the perpetrator.

Our review of the record also does not bear out the petitioner's contention that Phelmetta's identification was the only evidence tying him to the crime. Newell's testimony largely corroborated that of Phelmetta. He testified that he saw a young black male wearing a hoodie cross Columbus Avenue, approach the victim's car from behind, and fire into the driver's window as a female passenger fled the vehicle from the passenger side. Newell reported seeing the same individual a short time later on Frank Street, just around the time that Diaz saw a man fitting the same description, who appeared to be the petitioner, running down and across Frank Street.

It is true that Newell himself was not able to identify the petitioner as the shooter and, also, that there was

Bowens *v.* Commissioner of Correction

some ambiguity as to whether Diaz actually identified the petitioner or merely observed that the individual whom she saw running down Frank Street immediately after the shooting looked like the petitioner and ran behind a house that was frequented by the petitioner. There is no doubt, however, that the jury, considering Newell's and Diaz' testimony together, reasonably could have concluded that the petitioner was the perpetrator. At the very least, the testimony of Diaz, a neighbor, that a man who looked remarkably like the petitioner ran behind a house frequented by the petitioner moments after the shooting would have given the jury reason to doubt the petitioner's alibi defense that he spent the evening at a party on the other side of town. For all of these reasons, we conclude that the habeas court correctly concluded that the identification procedures employed in this case did not violate the petitioner's due process rights.

### III

We next consider the petitioner's claim that his first habeas counsel, Cannatelli, provided ineffective assistance by failing to pursue a claim against his trial counsel, Ullmann, for failing to properly impeach the state's alibi rebuttal witness, Crystal Bethea (Crystal). We are not persuaded.[14]

### A

The following additional facts are relevant to this issue. The petitioner presented an alibi defense at trial. He took the stand and testified that, on the evening of the shooting, he had been at his mother's home at 56

[14] Because we resolve the petitioner's actual innocence claim on the merits; see part I of this opinion; we need not address his predicate claim that Cannatelli acted deficiently in failing to withdraw that claim during the first habeas trial. The petitioner states in his brief that he contends that Cannatelli provided ineffective assistance only to overcome the respondent's assertion that that his actual innocence claim is barred by the doctrine of res judicata.

Bowens *v.* Commissioner of Correction

Glemby Street in Hamden, together with his friend, Jackson, and his parents. He and Jackson then decided to leave to attend a birthday celebration for Jackson's cousin, Cox, at Crystal's home in the Fair Haven section of New Haven. They called for a taxicab from Metro Taxi and, at approximately 10 p.m., more than one hour before the shooting occurred, traveled by taxicab from Hamden to the celebration.

The petitioner further testified that he and Jackson remained at Cox' residence for "a couple of hours." Around midnight, the petitioner called for another taxicab and requested a driver named Nina, with whom he was acquainted. When Nina arrived, the petitioner and Jackson traveled in her taxicab to a diner, where they ordered take-out food. They then smoked marijuana in the taxicab as Nina drove them back to 56 Glemby Street in Hamden, where they arrived at approximately 1 a.m.

The petitioner further testified that, on the day of the murder, he was never present at the intersection where the shooting occurred and also that he was never on Frank Street that day. He also specifically denied that he shot the victim.

The defense presented four additional witnesses in support of the alibi. First, Jackson testified that she and the petitioner traveled by taxicab from Hamden to the celebration in Fair Haven at 9:30 p.m. and remained there until approximately 1 a.m. She also recalled that she called for a taxicab to take herself and the petitioner home but denied that she and the petitioner previously knew Nina or requested her as the driver. She did testify, however, that they took the taxicab to a diner, purchased food, and smoked marijuana with Nina, the driver, before returning to Hamden. Jackson recalled that she arrived at her home in Hamden at approximately 2 a.m.

Second, Stacy Bethea (Stacy) testified that she was already at 4 Bailey Street in Fair Haven with her cousins, Cox and Crystal, and their respective children, when Jackson arrived with the petitioner. Stacy recalled that Jackson and the petitioner later departed in a taxicab, but she could not remember at what times they arrived or left the residence. She also testified that she had not known the petitioner prior to that night, never saw him again, could not recall what he looked like, and could not identify him in court.

Cox was the petitioner's third alibi witness. She confirmed that her birthday is August 18, the same date as the charged murder. She testified that, on the night of the shooting, she was celebrating at Crystal's Fair Haven apartment. She recalled that the petitioner and Jackson arrived there by taxicab sometime between 9:30 and 10 p.m. and stayed at the party for approximately three hours. Cox also remembered seeing Jackson call for a taxicab before Jackson and the petitioner departed around 12:30 or 1 a.m.

Cox, like Jackson, testified that she had learned of the petitioner's arrest on August 19, the day following the murder, notwithstanding testimony by police officers, and the petitioner's own acknowledgement, that he was not arrested until three days later, on August 22. Both Cox and Jackson admitted that they did not go to the police to inform them that the petitioner had been with them in Fair Haven at the time of the shooting.

The petitioner's final alibi witness was Francis Anderson, a manager from Metro Taxi. Anderson authenticated documents from his company's computerized database that memorialized two telephone calls that the company had received on August 18 and 19, 1996. On the basis of those records, he testified that the company dispatched a taxicab to 56 Glemby Street in Hamden at 10:03 p.m., with a stated destination of 4 Bailey Street

in Fair Haven, and that the company dispatched another taxicab at 12:51 a.m. to 4 Bailey Street, with a stated destination of "56 Geny Street" in New Haven.[15]

Anderson testified that the driver of the taxicab that responded to the second call was female but that he could not recall her name. He also conceded that the records did not specify whether a taxicab actually went to Glemby Street in Hamden at 10:03 p.m., who, if anyone, it picked up at that location, or whether it ever went to Bailey Street in New Haven. Likewise, he could not confirm whether a taxicab actually went to 4 Bailey Street in New Haven at 12:51 a.m., whether it picked up anyone at that location, or whether it transported anyone anywhere after that.[16] Finally, on cross-examination, Anderson estimated that it would take only ten minutes to travel from Bailey Street to Frank Street in New Haven.

The petitioner did not call Crystal to testify, even though she also allegedly had been present at her home for Cox' celebration at the time the murder transpired. The state called Crystal as a rebuttal witness. She testified that she did not know the petitioner and that she had never seen him before.

On cross-examination, Crystal indicated that she recalled that Cox, Jackson, and Stacy were present at her apartment on the evening of August 18, 1996, but that she did not recall the petitioner being there. Ull-

---

[15] Anderson stated that, to the best of his knowledge, there is no Geny Street in either New Haven or Hamden, suggesting that the entry was likely a scrivener's error.

[16] The call records indicate that both calls were for a single passenger. That is to say, on each document, the field titled "# Psgrs" has an entry of "1." Anderson's testimony did not indicate whether, if the call had in fact been made for two passengers, Metro Taxi's ordinary business practice would have been to indicate that by entering a "2" on the "# Psgrs" field of the form. It is impossible to know, then, whether the jury may have interpreted those documents as evidence that only Jackson attended Cox' celebration.

Bowens *v.* Commissioner of Correction

mann was able to establish that she had been drinking alcohol that night.

At the second habeas trial, Ullmann testified that he began representing the petitioner in September, 1996. He learned at their first meeting that the petitioner had a potential alibi defense, and he filed a notice of alibi shortly thereafter. He testified that his investigator, Donna Harris, was able to identify, locate, and interview three of the potential alibi witnesses: Cox, Jackson, and Crystal. In his case file, Ullmann retained a handwritten investigative report in which Harris memorialized a September, 1996 phone interview she had conducted with Crystal. In the report, Harris recounted: "Ms. Bethea relates the following. On August 18, 1996, she arrived home (4 Bailey St.—New Haven) between 9:30-10 p.m. [The petitioner, Jackson and Cox] were already there. Everyone stayed until 12:30-1 a.m. when [the petitioner, Jackson and Cox] left by cab. Cab was called from her apartment."

Ullmann subsequently interviewed Crystal on two occasions during the petitioner's criminal trial. The second interview took place at the courthouse on June 5, 1998. This was the same day that the state rested its case and the defendant presented his alibi witnesses, and just four days before the state called her to testify as a rebuttal witness.

At the second habeas trial, Ullmann was questioned as to why, when Crystal testified at trial that she had never met the petitioner, he did not confront her with her prior conflicting statement to Harris that the petitioner had attended Cox' celebration. Ullmann testified that he could not recall his reasoning. The petitioner did not call Crystal to testify at the habeas trial, and, although Harris testified, she was unable to recall the details of her conversation with Crystal.

Bowens *v.* Commissioner of Correction

The petitioner then called Sheehan, a highly experienced criminal defense attorney, as a legal expert. Sheehan remarked that Crystal's unimpeached testimony was "important," "dramatic" and "powerful," and he opined that a reasonable defense attorney would have either confronted her with her prior statement or called Harris to testify. As to Cannatelli, Sheehan observed that he had alleged ineffective assistance by Ullmann on several bases, but, Sheehan opined, those claims were weaker than a claim premised on Ullmann's failure to impeach Crystal with her statement to Harris. Consequently, Sheehan opined that, *assuming that Ullmann had no strategic reason for failing to impeach Crystal's testimony*, Cannatelli's failure to claim that Ullmann was ineffective for failing to impeach Crystal also was unreasonable.

The habeas court found that the petitioner had failed to prove his claim related to Ullmann's decision not to impeach Crystal because the petitioner had not established either necessary element of an ineffective assistance claim, namely, deficient performance or prejudice. See part III B of this opinion. As to deficient performance, the habeas court stated that, in light of the presumption that counsel acted competently, Ullmann's excellent reputation, and the fact that Ullmann spoke twice with Crystal in the week before her testimony and made a strategic decision not to call her as a witness, the court was "hesitant to draw the inference that such omission was the result of oversight rather than discretion." The court speculated that "[w]hatever information he gleaned from her, motivated . . . Ullmann to decline to call Crystal as a witness and may have caused him to be cautious when cross-examining her as a rebuttal witness."

With respect to prejudice, the habeas court noted, among other things, that (1) the petitioner did not call Crystal to testify at the habeas proceeding, and so failed

Bowens *v.* Commissioner of Correction

to establish how she would have responded if confronted with her statement, (2) the state's brief direct examination of Crystal was limited to asking whether she previously had seen the petitioner, (3) Ullmann was able to establish on cross-examination that Crystal had been drinking on the night in question, and (4) Crystal's testimony did not figure prominently in either attorney's closing arguments, which focused primarily on the testimony of Phelmetta and Diaz. Accordingly, the habeas court found that the petitioner's claim that Ullmann provided ineffective assistance of counsel lacked merit, and, as such, the petitioner could not prove that Cannatelli was ineffective in failing to challenge Ullmann's failure to impeach Crystal during the first habeas trial.

B

The following well established principles govern our analysis of this claim. "[T]he habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review. . . .

"To succeed on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy the two-pronged test articulated in *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). *Strickland* requires that a petitioner satisfy both a performance prong and a prejudice prong. To satisfy the performance prong, a claimant must demonstrate that counsel made errors so serious that counsel was not functioning as the counsel guaranteed . . . by the [s]ixth [a]mendment. . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have

Bowens *v.* Commissioner of Correction

been different. . . . Although a petitioner can succeed only if he [or she] satisfies both prongs, a reviewing court can find against a petitioner on either ground. . . . (Citation omitted; internal quotation marks omitted.) *Johnson* v. *Commissioner of Correction*, 330 Conn. 520, 537–38, 198 A.3d 52 (2019).

C

With these principles in mind, we now consider whether the habeas court correctly concluded that Ullmann's decision not to impeach Crystal with her alleged statement to Harris did not constitute deficient performance or prejudice the petitioner's defense. Because we agree with the habeas court that Ullman's failure to question Crystal regarding that statement did not prejudice the petitioner's defense, we need not determine whether that court also correctly determined that Ullman's performance was not deficient. See id.

As we discussed, the petitioner did not call Crystal to testify at the habeas trial. Without knowing how Crystal would have explained and reconciled her allegedly inconsistent statements to Harris, it is impossible to know how the jury would have weighed them at the petitioner's criminal trial. Cf. *Gallimore* v. *Commissioner of Correction*, 112 Conn. App. 478, 483, 963 A.2d 653 (2009); *Adorno* v. *Commissioner of Correction*, 66 Conn. App. 179, 186, 783 A.2d 1202, cert. denied, 258 Conn. 943, 786 A.2d 428 (2001). That fact alone precludes a finding of prejudice.

It is also noteworthy in this regard that Stacy's activities and movements on the night of the murder tracked those of Crystal. Although Stacy testified that she did recall the petitioner attending the celebration, she also could not recall what he looked like or identify him in court. Further, the petitioner's own testimony was not necessarily inconsistent with Crystal's rebuttal testimony. Specifically, in testifying as to his whereabouts and activities on the night of the murder, the petitioner

Bowens *v.* Commissioner of Correction

stated that he spent only a few minutes in the presence of Crystal during Cox' celebration. Further, he conceded that, during that period, he sat on a couch off to the side and largely remained quiet, while the four women sat in the kitchen talking among themselves. Accordingly, there is no reason to think that the jury would have viewed Crystal's inability to recall meeting the petitioner as overly damaging to his alibi defense. We thus conclude that, even if Ullmann's representation of the petitioner was deficient, the petitioner has failed to establish that he was prejudiced thereby.

IV

Lastly, we consider the petitioner's argument that the habeas court incorrectly concluded that his cruel and unusual punishment claims were barred by the doctrine of res judicata. Because we resolved the identical underlying constitutional questions in two other recent cases; see *State* v. *McCleese*, 333 Conn. 378, A.3d (2019); *State* v. *Williams-Bey*, 333 Conn. 468, A.3d (2019); we need not decide whether the habeas court misapplied the doctrine of res judicata.

The following additional procedural history is relevant to this issue. In March, 2016, the petitioner filed in the Superior Court a motion to correct an illegal sentence pursuant to Practice Book § 43-22. Relying on *Miller* v. *Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012),[17] and its progeny, he argued that it was cruel and unusual punishment for the trial court to have sentenced him to a term of imprisonment of fifty years for an offense that he committed at the age of seventeen, without first considering the mitigating

[17] In *Miller*, the United States Supreme Court held that mandatory life imprisonment without the possibility of parole for those who were under the age of eighteen at the time of their crimes violates the eighth amendment's prohibition against cruel and unusual punishment. See *Miller* v. *Alabama*, supra, 567 U.S. 489.

Bowens *v.* Commissioner of Correction

impacts of his youth. The petitioner acknowledged that, in *State* v. *Delgado*, 323 Conn. 801, 151 A.3d 345 (2016), and *State* v. *Boyd*, 323 Conn. 816, 151 A.3d 355 (2016), we concluded that the legislature's enactment of No. 15-84 of the 2015 Public Acts (P.A. 15-84)[18] "offers a constitutionally adequate remedy under the eighth amendment to those who qualify for parole under its provisions." (Internal quotation marks omitted.) *State* v. *Delgado*, supra, 808. He argued, however, that those cases did not resolve the issues of whether (1) the availability of parole adequately vindicates his rights under the constitution of Connecticut, and (2) P.A. 15-84 established a constitutionally adequate parole procedure.

The court rejected the petitioner's argument, concluding that resentencing was not required under the state constitution. Following what it believed to be the mandate of *Delgado* and *Boyd*, the court dismissed the petitioner's motion in March, 2017, rather than denying it. In May, 2017, the petitioner appealed from the dismissal of his motion. See *State* v. *Bowens*, Connecticut Appellate Court, Docket No. AC 40727 (appeal filed May 18, 2017). In August of that year, the Appellate Court, sua sponte, stayed that appeal pending this court's disposition in *Williams-Bey*.

At the same time, the petitioner also raised his cruel and unusual punishment claims in the present habeas

---

[18] Public Act 15-84, codified at General Statutes § 54-125a (f) (1) (A), provides in relevant part: "[A] person convicted of one or more crimes committed while such person was under eighteen years of age, who is incarcerated on or after October 1, 2015, and who received a definite sentence or total effective sentence of more than ten years for such crime or crimes prior to, on or after October 1, 2015, may be allowed to go at large on parole in the discretion of the panel of the Board of Pardons and Paroles for the institution in which such person is confined, provided . . . if such person is serving a sentence of fifty years or less, such person shall be eligible for parole after serving sixty [percent] of the sentence or twelve years, whichever is greater . . . ."

Bowens *v.* Commissioner of Correction

action, including in the operative second amended petition, which he filed in April, 2017. Although the respondent had raised a defense of res judicata only with respect to issues that the petitioner had raised on direct appeal or in the first habeas action, the habeas court, sua sponte, ruled that "[t]he respondent's res judicata defense bars this claim from being relitigated in this habeas case" because the precise claim had been litigated in the motion to correct an illegal sentence.

On appeal to this court, the petitioner contends that his cruel and unusual punishment claims should not have been denied on the basis of res judicata because (1) his motion to correct an illegal sentence was dismissed rather than denied on its merits, and (2) it would be perverse to require that, "*before* seeking to correct an illegal sentence in the habeas court, a defendant either must raise the issue on direct appeal or file a motion pursuant to [Practice Book] § 43-22 with the trial court" (emphasis added); *Cobham* v. *Commissioner of Correction*, 258 Conn. 30, 38, 779 A.2d 80 (2001); but then to conclude that filing such a motion pursuant to § 43-22 precludes a defendant from bringing a subsequent habeas action.

Even if we were to assume, for the sake of argument, that the petitioner is correct that the habeas court should have resolved his constitutional claims on the merits, he cannot prevail on those claims. After the present case was argued, we released our decisions in *State* v. *McCleese*, supra, 333 Conn. 378, and *State* v. *Williams-Bey*, supra, 333 Conn. 468, in which we rejected virtually identical claims. Specifically, we held in those cases that (1) parole eligibility under P.A. 15-84 is an adequate remedy under our state constitution just as it is under the federal constitution, and (2) because the opportunity for parole negates, rather than cures, a *Miller* violation, resentencing is not required, and P.A. 15-84 is constitutionally sound. Accordingly,

Bowens *v.* Commissioner of Correction

we need not determine whether the habeas court improperly applied the doctrine of res judicata.

The judgment is affirmed.

In this opinion, ROBINSON, C. J., and McDONALD, D'AURIA and MULLINS, Js., concurred.

ECKER, J., concurring in part and dissenting in part. I agree with and join parts I, II, and III of the majority opinion. I respectfully dissent, however, from part IV of the majority opinion, in which the majority concludes that, even if the cruel and unusual punishment claims raised by the petitioner, Tyreese Bowens, are not barred by the doctrine of res judicata, he cannot prevail on those claims in light of this court's recent decisions in *State* v. *McCleese*, 333 Conn. 378,    A.3d    (2019), and *State* v. *Williams-Bey*, 333 Conn. 468,    A.3d (2019). For the reasons articulated in my dissenting opinions in those cases, I believe that juvenile offenders cannot constitutionally be sentenced as adults without an individualized sentencing proceeding in which the sentencing judge *must* consider the mitigating effects of youth and its associated features, and also that the availability of parole eligibility under § 1 of No. 15-84 of the 2015 Public Acts, codified at General Statutes § 54-125a, is not a substitute for such an individualized sentencing hearing. See *State* v. *McCleese*, supra, 429 (*Ecker*, *J.*, dissenting); *State* v. *Williams-Bey*, supra, 477 (*Ecker*, *J.*, dissenting); see also *State* v. *Taylor G.*, 315 Conn. 734, 796–97, 110 A.3d 338 (2015) (*Eveleigh*, *J.*, dissenting).